UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
CLAYTON BROWN,

              :      **REPORT & RECOMMENDATION**

         Petitioner,

              :      **14 Civ. 3515 (VEC) (MHD)**

  -against-

              :

ROBERT CUNNINGHAM,

              :

         Respondent.

--------------------------------X

TO THE HONORABLE VALERIE E. CAPRONI, U.S.D.J.:

    Pro se petitioner, Clayton Brown, seeks a writ of habeas corpus to challenge his June 1, 2011 conviction in New York State Supreme Court, New York County. Petitioner was convicted of criminal sale of a controlled substance under N.Y. Penal Law §220.39(1) and was sentenced to seven years in a correctional facility and three years post-release supervision. He is currently serving his sentence at Woodburne Correctional Facility.

    Petitioner asserts three bases for habeas relief. First, he argues that the conviction was against the weight of the evidence. Second, he contends that the trial judge's order prohibiting his co-workers' attendance during the testimony of undercover officers denied him his right to a public trial under the Sixth Amendment. Lastly, he claims that his sentence was excessive and should be

reduced. Respondent argues that the claims addressed to the weight of the evidence and the sentence are not cognizable on habeas review, and that the public-trial claim is meritless. For the reasons set forth below, we recommend that the petition be denied.

## BACKGROUND AND PRIOR PROCEEDINGS

On October 9, 2010, petitioner was arrested for criminal sale of a controlled substance during a "buy and bust"[1] after two undercover officers purchased drugs from petitioner's co-defendants, Victor Ragnor and Michael Howell. (Second Transcript dated May 13, 2011 ("Trial Tr.") at 7-20, 102, 109). A New York County grand jury returned a five-count indictment against the three defendants. (First Transcript dated May 12, 2011 ("Pre-Trial Tr.") at 2-3; see also Indictment [docket no. 9 attach. 1 pp. 1-12]). On May 12, 2011, petitioner went to trial before the Hon. Robert M. Stolz, S.C.J., and a jury on a single count of criminal sale of a controlled substance, specifically, cocaine. (Id.; Trial Tr. 109). At the start of the trial, the court conducted a Hinton

---

[1] A "buy and bust" is an undercover operation in which the undercover officer purchases drugs from a dealer, after which a field-team of officers arrests the dealer and other accomplices. (See Second Transcript dated May 13, 2011 at 7).

2

hearing to ascertain the necessity and scope of the court closing during the testimony of the two undercover officers, referred to in the proceedings as Undercovers 14 ("UC 0014") and 91 ("UC 0091"). (First Transcript dated May 13, 2011 ("Hinton Tr.") at 21-41). At the conclusion of that proceeding, Justice Stolz ordered a partial closure, but allowed petitioner's niece and girlfriend to be present. (Id. at 39-41).

During trial, the prosecution called UC 0091, UC 0014, and Detective Salvador Toro -- the arresting officer -- to testify. (Trial Tr. 3, 60, 95). Based on that evidence, the jury convicted petitioner on the single count, and the court thereafter sentenced him to seven years in prison, to be followed by three years of post-release supervision.

## I. The Hinton Hearing

At the May 13, 2011 Hinton hearing, UC 0014 and UC 0091 testified that they were fearful for their safety and the safety of others if their identities were to be revealed. (Hinton Tr. 24-26, 33-35). Each testified to having received threats in the past. (Id. at 24, 32). For example, UC 0014 stated as follows:

3

I've been told if I find out you're a cop, I'm going to do you. I've been shown guns and again told you better not be a cop. Shots have been fired in my direction where I had to dive behind a vehicle, not to get hit by the bullets. Ex-partner had to discharge his firearm, because my identity was compromised and a guy was coming at me with a machete, so I've been -- rocks have been thrown at me. So, those are some of the ways I've been threatened.

(Id. at 24). Additionally, both officers testified to taking steps to conceal their identities, stating that -- when attending court proceedings -- they wear plain clothes, do not carry a badge, and enter through side doors. (Id. at 24-25, 33).

In addition to safety concerns, the officers stated that they had numerous open and active cases in Harlem -- near the scene of the crime -- and the surrounding area and that those investigations would be negatively impacted if their identities were revealed. (Id. at 22-24, 31-32, 34).

The prosecutor asked that the courtroom be closed, but consented to the presence of defendant's girlfriend and niece. (Id. at 38). As the basis for his argument, the prosecutor relied on the "four prongs to the test to determine when closure is appropriate" (id. at 37), presumably invoking Waller v. Georgia, 467 U.S. 39 (1984) and its progeny, which we will discuss below. See infra pp. 37-43.

4

The defense requested that Brown's co-workers be allowed to be present in addition to his family. (Hinton Tr. 38). The prosecutor, however, opposed the presence of the co-workers, explaining that "[t]hey are not family, Judge.  They are co-workers at a moving company." (Id.). He insisted that those co-workers did not fall within the umbrella of those "the case law contemplates . . . [such as] family members and other close relatives so that the defendant feels comfortable." (Id. at 39). Additionally, the prosecutor explained that "two of the people whose names were provided[,] Irving Santana and Stanley Jeudy . . . both have criminal records, which are troubling in that they have robbery convictions in the past, recent robbery convictions." (Id.).

In the wake of these presentations, the trial judge ordered that the courtroom be closed during the testimony of UC 0014 and UC 0091. (Id. at 39-41). While the judge allowed the defendant's niece and girlfriend to be present in the courtroom, he excluded the co-workers. (Id. at 41). Defendant did not thereafter object to the court's ruling.

5

II. <u>Evidence at Trial</u>

At trial, the prosecutor called the two undercover officers, UC 0091 and UC 0014. (Trial Tr. 3-94). The officers recounted that, on October 9, 2010, they were approached by an individual -- later identified as Victor Raynor -- and were solicited to buy marijuana. (<u>Id.</u> at 13-14, 66-67, 80).[2] UC 0091 told Mr. Raynor that "my man [UC 0014] is looking for hard," referring to crack cocaine. (<u>Id.</u> at 67). UC 0014 concurred, specifying that he was looking for "four dimes."[3] (<u>Id.</u> at 15, 42). Raynor then called over Mr. Howell, who asked whether Raynor knew these men. (<u>Id.</u> at 15-16, 42-44). Raynor replied, "[Y]eah, yeah, he's okay, I know him." (<u>Id.</u> at 15-16; <u>see also id.</u> at 42-44).

The officers testified that, at this point, Clayton Brown approached and, like Howell, asked Raynor if he was sure he knew UC 0014. (<u>Id.</u> at 17, 44). Again, Raynor answered in the affirmative. (<u>Id.</u> at 17, 44). Brown then directed Howell to bring UC 0014 around

---

[2] UC 0091 could not recall the direction from which Mr. Raynor approached. (Trial Tr. 80).

[3] This refers to four ten-dollar bags, vials, or so-called "twisties." (Trial Tr. 15). Twisties are apparently "crack twists, saran [w]rap twists of crack." (<u>Id.</u> at 108).

6

the corner to 124th Street and Park Avenue.[4] (Id. at 17, 22-24, 45). Brown followed behind UC 0014 and Howell, staying approximately a car-length away from the two men during the transaction. (Id. at 24, 70). UC 0014 stated that while Brown "was a lookout," Howell gave UC 0014 four "twisties" and UC 0014 gave Howell $40 of pre-recorded buy money.[5] (Id. at 24).[6] UC 0091 stayed behind and purchased marijuana from Raynor. (Id. at 69, 84). UC 0091 partially observed UC 0014 during the transaction with Howell, although the view was obstructed at certain times. (Id. at 89, 93). There was differing testimony regarding the duration of the encounter. UC 0014 testified that the event lasted between three and four minutes (id. at 26), and UC 0091 testified that the encounter lasted ten to fifteen minutes. (Id. at 71).

---

[4] During the grand jury proceeding, UC 0014 testified that "Raynor direct[ed] Howell to go around the corner . . . to serve [him]." (Id. at 51).

[5] Pre-recorded buy money is photocopied prior to the buy-and-bust -- and its serial numbers recorded -- for purposes of keeping track of the cash used during the operation. (Trial Tr. 9).

[6] During trial, there was confusion about the order in which the buy money was distributed amongst the agents. Initially, UC 0014 testified that he had received the pre-recorded buy money directly from Detective Toro (Trial Tr. 10), but on cross-examination he testified that "[i]n the car we all divided the money amongst us." (Id. at 48). Ultimately, he acknowledged that he was "not sure who the undercover is who had the money initially." (Id.).

7

Following the exchange, and after walking away from Raynor, Howell, and Brown, UC 0014 broadcast over his radio that it was a "positive buy" and gave the description of the three suspects to Detective Toro, who also testified at trial. (Id. at 27-28; 102-03). UC 0014 described Brown as wearing a "white shirt, with blue jeans, but more grayish color with the black hat." (Id. at 27-28; 102-03). UC 0014 did not recall giving the description of Jeffrey Hatton, another buyer who had approached Howell. (Id. at 53-54).

Detective Toro observed three individuals who matched the description that UC 0014 had given and arrested them. (Id. at 102-03, 109-10). According to Detective Toro, no one else in the area matched those descriptions. (Id. at 103). Ultimately, the officers found no drugs or pre-recorded buy money on petitioner during his arrest (id. at 113), although Howell possessed both the pre-recorded buy money and crack twists. (Id. at 106-08).

Defense counsel called no witnesses and presented no affirmative defense.[7] (See Trial Tr. 118). The jury returned a

---

[7] Petitioner filed a pro se motion under N.Y. Crim. Proc. Law § 330.30 asserting that he had received ineffective assistance of counsel because the attorney had not called petitioner's girlfriend to testify on his behalf. (Transcript dated June 1, 2011 ("Sentencing Tr.") at 17-20). The trial court denied this motion. (Id.).

8

guilty verdict on May 16, 2011. (Transcript dated May 16, 2011 ("Trial Tr. II") at 42).

III. <u>Sentencing</u>

On June 1, 2011, the prosecutor requested that petitioner be sentenced to nine years of imprisonment. (Sentencing Tr. 13). In arguing for that sentence, he noted that petitioner was on lifetime parole at the time of this conviction (<u>id</u>. at 6), and had multiple prior convictions, including a 1997 conviction for attempted rape in the first degree, sexual abuse, and robbery in the first degree (<u>id.</u> at 3, 11), a 1995 conviction for robbery in the second degree (<u>id.</u> at 9, 12), a 1992 conviction for attempted criminal possession of a loaded firearm (<u>id.</u> at 12), and a 1991 conviction for attempted robbery in the second degree. (<u>Id.</u>). The court deemed petitioner to be a "predicate felon[]" due to his prior conviction for attempted rape (<u>id.</u> at 7), and the prosecutor argued that "Mr. Brown's history shows he is the kind of serious violent felon who has disregard for society and will readily engage in violent conduct." (<u>Id.</u> at 12).

Defense counsel requested the minimum sentence of six years, and asserted that it was a "rather significant jail sentence" for

9

the alleged conduct. (Id. at 13-14, 17). Petitioner continued to assert his innocence, claiming that he was in the area to visit his girlfriend and did not know the co-defendants. (Id. at 15-16). To advocate for a lesser sentence, counsel further argued that petitioner was employed at a moving company and had not been cited for a violation from his parole officer since the start of the case. (Id. at 15). Petitioner also submitted various items reflecting his educational attainments, including a transcript from Bronx Community College and a training certificate from OSHA. (Id. at 21). The court sentenced him to seven years in prison with three years post-release supervision. (Id. at 22).[8]

## IV. Direct Appeal

Petitioner filed a notice to appeal on September 8, 2011 with the Appellate Division, First Department. (Brief for Defendant-Appellant ("App. Br.") [docket no. 9 attach. 1 pp. 4-53])[9]. On

---

[8] As noted, defendant was on lifetime probation at the time of his conviction, and therefore his conviction could have triggered an additional prison term for parole violation. (Id. at 15). Nothing in the record speaks to whether this additional sentence was imposed, however; it only notes the possibility of such a consequence.

[9] Citations to this brief will be to its internal pagination and not that of the collection of exhibits included with respondent's opposition.

appeal, he argued (1) that his conviction was against the weight of the evidence, in violation of the Fourteenth Amendment of the United States Constitution and Article 1, Section 6 of the New York Constitution (id. at 29-37), (2) that the court had violated his right to a public trial under the Sixth Amendment by excluding his co-workers (id. at 37-41), and (3) that his sentence was excessive and should be reduced in the interest of justice. (Id. at 42-44).

In pressing the weight-of-the-evidence claim, petitioner argued that the officers' testimony at trial was not credible for numerous reasons, including because (1) UC 0014 was "not sure" whether he or the other undercover officers involved had radioed in Hatton's description (id. at 30), (2) UC 0091 was engaged with Raynor when UC 0014 was executing the buy and did not himself observe the transaction (id. at 31, 35), (3) UC 0014 testified that undercover officers "don't walk together" but later testified that the officers had in fact walked together (id. at 31), (4) in the grand jury proceeding, UC 0014 testified that Raynor "directed Howell to go around the corner to serve [him], and he would look out," which conflicted with UC 0014's testimony at trial (id. at 33), (5) UC 0014's testimony about the origins of the pre-recorded buy money was somewhat contradictory (id.), (6) UC 0091 could not recall details about the traffic or whether there were people at

11

the bus stop near where he stood (id. at 34), (7) UC 0091 did not
recall the direction from which Raynor or Howell had approached
(id. at 35), (8) UC 0091 "never noticed Hatton" (id.), and (9) UC
0014 and UC 0091 gave different estimates of the duration of the
interaction -- UC 0014 testified that it had lasted for three to
four minutes whereas UC 0091 testified that it had lasted for ten
to fifteen minutes. (Id. at 35-36).[10]

Petitioner's Sixth Amendment claim focused almost entirely on
state-court interpretations of Waller generally, and People v.
Nazario in particular. (Id. at 39 (quoting People v. Nazario, 4
N.Y.3d 70, 72, 790 N.Y.S.2d 628, 629-30 (2005) ("A number of our
cases applying this rule establish that an order of closure that
does not make an exception for family members will be considered
overbroad."))). Petitioner argued that "defense counsel made a
'prima facie showing of a significant personal relationship'" with
his co-workers and, therefore, the trial court should have allowed
them to be present. (Id. at 40-41 (quoting Nazario, 4 N.Y.3d at 74,
790 N.Y.S.2d at 631)).

---

[10] Other, more conclusory arguments on this point included
suggesting that the undercover officers did not have a clear
understanding of their roles as either a "primary" or "ghost"
(observer) officer (id. at 31-32) and that Brown's involvement
was limited to asking, "are you sure you know this guy" and
telling Howell to take UC 0014 around the corner (id. at 32-33).

12

Petitioner's third argument on direct appeal relied exclusively on state law. (Id. at 42-44). Brown's counsel argued that "[t]he court has 'broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range', and even though it was not an abuse of discretion." (Id. at 42 (quoting People v. Delgado, 80 N.Y.2d 780, 783, 599 N.E.2d 675, 676 (1992))). Invoking this authority, petitioner "urge[d] th[e] Court, in the interest of justice, to reduce his sentence to six years imprisonment, to be followed by one and one-half years of post-release supervision." (Id. at 44).

The Appellate Division affirmed the conviction and sentence. People v. Brown, 107 A.D.3d 499, 500, 967 N.Y.S.2d 59, 60 (1st Dep't 2013). The court rejected petitioner's argument that the conviction was against the weight of the evidence, noting that "[t]here is no basis for disturbing the jury's credibility determinations, including its evaluation of inconsistencies in testimony." Id. With respect to petitioner's second argument, the court stated as follows:

> After the People established a proper basis for closing the courtroom to the general public during the testimony of undercover officers, the court only permitted defendant's family to attend, and it excluded three of his coworkers. Defendant made no showing of a significant personal relationship . . . [and] did not meet

13

defendant's burden of showing that the proposed
spectators were "linked to him by some tie of more
significance than ordinary friendship."

Id. (quoting Nazario, 790 N.Y.S.2d at 630, 4 N.Y.3d at 74).
Finally, the court "perceive[d] no basis for reducing the
sentence." Id.

On June 13, 2013, Brown sought leave to the New York Court of
Appeals (docket no. 9 attach. 1 pp. 97-103), which respondent
opposed. (Id. at pp. 104-07). The Court of Appeals denied
petitioner's request on August 28, 2013. (Id. at p. 108).

V. The Current Habeas Petition

Petitioner filed for habeas corpus relief on May 7, 2014.[11]
(Docket no. 1). Brown asserts the same three grounds for relief as
he raised on direct appeal. (Pet. ¶ 13). The only variation is that

---

[11] Respondent acknowledges the timeliness of the petition
(Opp. Mem. 1), likely in recognition of the May 7, 2014 filing
being well within the statute of limitations contemplated by 28
U.S.C. § 2244(d). This provision allows for the filing of habeas
petitions within one year of "the date on which the judgment
became final by the conclusion of direct review." Id. In cases
such as ours, a petitioner's conviction is final 90 days after
the New York Court of Appeals denies leave to appeal. See, e.g.,
Williams v. Artuz, 237 F.3d 147, 150-51 (2d. Cir. 2001). Since
the New York Court of Appeals denied petitioner's request for
leave on August 28, 2013 and, therefore, the conviction became
final on November 26, 2013, his May 7, 2014 filing is well within
the statute of limitations.

14

within his first claim -- that his conviction was against the weight of the evidence -- petitioner includes a claim of actual innocence. (Id.).

Respondent argues that the petition should be dismissed and/or denied, where applicable, and that a certificate of appealability not issue. (Opp. Mem. 22). Respondent asserts that petitioner's first and third claims -- the weight-of-the-evidence claim and the excessive-sentence claim -- are non-cognizable state-law claims. (Id. at 12, 14-15, 19-21). Alternatively, "to the extent these claims might be construed to allege a deprivation of a federal right . . . petitioner did not exhaust his state court remedies because he never presented these claims to the state courts as federal claims." (Id. at 12).

Respondent states that the weight-of-the-evidence argument is a state law claim grounded in N.Y. Crim. Proc. Law § 470.15 and is, therefore, not reviewable by a federal habeas court. (Id. at 14 (quoting Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2007) & citing Lewis v. Jeffers, 497 U.S. 764, 780 (1990))). Additionally, respondent argues that petitioner's reference to actual innocence does not merit relief because "this type of freestanding claim is not cognizable on federal habeas review, at

15

least outside the context of capital punishment, as in this case."

(Id. at 15 (quoting Herrera v. Collins, 506 U.S. 390, 400 (1993))).


Respondent also asserts that petitioner's sentencing claim is grounded solely in state law and, therefore, not cognizable on habeas review. (Opp. Mem. 19-21). Respondent adds that

> [a]lthough it is possible than an error of state law might by so deleterious to the fairness of the proceedings that it constitutes a denial of federal due process, Pulley v. Harris, 465 U.S. 37, 41 (1984) (suggesting that an "error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law"), no such concern arises as to the length of a sentence when it is within the range prescribed by state law.

(Id. at 20).


In response to petitioner's Sixth Amendment claim, respondent argues that the Appellate Division's ruling was neither contrary to, nor an unreasonable application of, Supreme Court precedent. (Id.). Respondent asserts that petitioner's argument is largely based on People v. Nazario, which "is not a holding of the Supreme Court of the United States and therefore does not qualify as 'clearly established' federal law." (Id. at 18). In sum, Nazario governs closure orders affecting family members or "where the defendant has shown that there is a special relationship between a proposed spectator and the defendant," 4 N.Y.3d at 72, 790 N.Y.S.2d

16

at 629, a standard that petitioner's appellate counsel seemingly read to be stricter -- in certain contexts -- than Waller itself.

Respondent briefly surveys the state of Supreme Court precedent on the subject to conclude that no Nazario-type standard exists in Supreme Court jurisprudence. (Opp. Mem. at 18-19). To emphasize the point, respondent cites a Second Circuit case for the same proposition, specifically that "no clearly established federal law 'demand[s] a higher showing before excluding a defendant's friends and family' from the courtroom.'" (Id. at 19 (quoting Rodriquez v. Miller, 537 F.3d 102, 106 (2d Cir. 2007))).

Petitioner filed a reply to respondent's Memorandum of Law on August 15, 2014. (Docket no. 12). Petitioner asserts that his first claim is a cognizable federal claim. (Pet'r's Reply ¶ A(2)(a)). He argues that his "Appellate attorney raised a federal claim in the state Appellate Courts when he argued that Appellant's conviction was against the w[ei]ght of the evidence where the police testimony was unworthy of belief," and he cites to Jackson v. Virginia, 443 U.S. 307 (1979) (Pet'r's Reply ¶ A(2)(a)) -- a case indeed cited, although not discussed, in his original brief to the Appellate Division. (See App. Br. 29). Additionally, he argues that his

17

"weight of the evidence claim amounts to no more or less than an actual innocence claim." (Pet'r's Reply ¶ A(2)(a)).

Petitioner concedes that his third claim -- regarding his sentence -- does not state a federal claim. (Id. at ¶ A(2)(b)). In light of this concession, petitioner adjusts this claim by contending that

> the severity of the sentence is a result not of the amount of time imposed by the state trial court, but . . . in the fact that Petitioner has always claimed actual innocence . . . . As such, in the interest of judicial economy, Petitioner requests the court not to consider this third claim as a separate claim, but rather as a natural extension of his claim of actual innocence.

(Id.).

Additionally, in response to respondent's argument that the state court ruling on petitioner's public-trial claim was not contrary to or an unreasonable application of Supreme Court precedent, petitioner claims that "these Supreme Court holdings are inherently founded in the U.S. Constitution's Articles and Amendments. As such, and given clear congressional intent of 28 U.S.C sec. 2254(a), petitioner is not procedurally obligated to cite U.S. Supreme Court precedents over U.S. Constitution Amendments for Constitutional violations he seeks relief from." (Pet'r's Reply ¶ (B)(1)). As to the merits of the claim, petitioner

18

contends that the trial court's order was contrary to, and an unreasonable application of, <u>Waller</u>'s four-pronged test governing trial closures. (Pet'r's Reply ¶ (B)(2)-(3)).

<strong>ANALYSIS</strong>

I. <u>General Standard of Habeas Review</u>

The stringency of federal habeas review turns on whether the state courts have passed on the merits of a petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8 U.S.C. § 2254(d); <u>see</u>, <u>e.g.</u>, <u>Harrington v. Richter</u>, 562 U.S. 86, __, 131 S.Ct. 770, 783-84 (2011); <u>Bell v. Cone</u>, 535 U.S. 685, 693-94 (2002); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000)

19

(O'Connor, J., concurring); Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010), vacated on other grounds sub nom., Portalatin v. Graham, 624 F.3d 69 (2d Cir. 2010) (en banc); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 498 (2d Cir. 2002).

Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Howard, 406 F.3d at 122 (quoting Williams, 529 U.S. at 413); see also White v. Woodall, 134 S.Ct. 1697, 1706 (2014) ("This is not to say that § 2254(d)(1) requires an identical factual pattern before a legal rule must be applied.") (internal quotation omitted); Marshall v. Rodgers, 133 S.Ct. 1446, 1448 (2013).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant

20

habeas simply because, in its independent judgment, the 'relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Howard, 406 F.3d at 122 (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001)). The Supreme Court observed in Williams that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. As implied by this language, "'[s]ome increment of incorrectness beyond error is required . . . [H]owever . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)); accord Richard S. v. Carpinello, 589 F.3d 75, 80 (2d Cir. 2009).

Under the Supreme Court's more recent, and arguably more stringent, interpretation of the statutory language, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at __, 131 S.Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652,

21

664 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at ___, 131 S.Ct. at 786. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. In other words, to demonstrate an 'unreasonable' application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. "As Harrington bluntly states, '[i]f this standard is difficult to meet, that is because it was meant to be.'" Young v. Conway, 715 F.3d 79, 98 (2d Cir. 2013) (quoting Harrington, 562 U.S. at ___, 131 S.Ct. at 786); see also White, 134 S.Ct. at 1702.

As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a State court

shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S., 589 F.3d at 80-81; McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see also Rice v. Collins, 546 U.S. 333, 338-39 (2006).

## II. Relevant Procedural Requirements

### A. Cognizable Federal Claims

It is well established -- and not an issue of dispute between the parties (see Pet'r's Reply ¶ A(2)(b)) -- that a habeas court may only address federal claims. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Ponnapula v. Spitzer, 297 F.3d 172 (2d Cir. 2002). The Supreme Court has long held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." McGuire, 502 U.S. at 68 (citing cases).

Petitioner's first and third claims are framed under state law. Petitioner first claims that his conviction was against the

23

weight of evidence. (See Pet. ¶ 13; App. Br. 29-37). This claim is clearly grounded in New York state law under Crim. Proc. L. § 470.15(5), and, on its face, is therefore not a cognizable federal claim. See, e.g., Cintron v. Fisher, 2012 WL 213766, *3 (S.D.N.Y. Jan. 24, 2012); Garrett, 438 F. Supp. 2d at 470; Douglas v. Portuondo,232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) ("A federal habeas court cannot address 'weight of the evidence' claims because 'a challenge to a verdict based on the weight of the evidence is different from one based on sufficiency of evidence. Specifically, the 'weight of the evidence' argument is a pure state law claim . . . whereas a legal sufficiency claim is based on federal due process principles.'") (quoting Garbez v. Greiner, 2002 WL 1760960, *8 (S.D.N.Y July 30, 2002)).

A court, however, must liberally construe a pro se petition. See, e.g., Haines v. Kerner, 404 U.S. 519, 520 (1972); Williams v. Cleary, 2 F. App'x 85, 86 (2d Cir. 2001); Askour v. Haouzi, 2012 WL 3561071, *1 (S.D.N.Y. Aug. 17, 2012). Therefore, "weight of the evidence" challenges are frequently analyzed as "insufficiency of the evidence" claims, which the Supreme Court has held are "cognizable in a federal habeas corpus proceeding." See Jackson, 443 U.S. at 321; see also Klosin v. Conway, 501 F. Supp. 2d 429,

24

439 (W.D.N.Y. 2007) (citing cases); Wilson v. Senkowski, 2003 WL 21031975, *8 (S.D.N.Y. May 7, 2003).

Petitioner's third argument -- that his "sentence is excessive, and should be reduced in the interest of justice" (Pet. ¶ 13; see also App. Br. 42-44) -- is grounded in a state law that allows a reviewing court to exercise its discretion to reduce a sentence in the interest of justice. See, e.g., People v. Rosenthal, 305 A.D.2d 327, 329, 760 N.Y.S.2d 460, 462 (1st Dep't 2003) ("[T]his Court also possesses broad, plenary powers to modify a sentence that is unduly harsh or severe under the circumstances, in the interest of justice, even though the sentence falls within the permissible statutory range.") (citing cases & N.Y. Crim. Proc. Law § 470.15); Delgado, 80 N.Y.2d at 783, 587 N.Y.S.2d at 272. Such a claim does not present a cognizable federal issue. See, e.g., Baide-Ferrero v. Ercole, 2010 WL 1257615, *4 (S.D.N.Y. Mar. 31, 2010); Edwards v. Marshall, 589 F. Supp. 2d 276, 290 (S.D.N.Y. 2008); Jenkins v. Artuz, 2003 WL 21499889, *3 (E.D.N.Y. June 13, 2003) ("The assertion that a sentencing judge abused his or her discretion is not a cognizable federal claim subject to review by a habeas court. A challenge to the term of a sentence will not support a petition if the sentence falls within the statutory range.") (internal citations omitted).

However, again, we must construe petitioner's claims liberally. <u>See</u>, <u>e.g.</u>, <u>Haines</u>, 404 U.S. at 520. Accordingly, although petitioner did not raise an Eighth Amendment claim either on direct appeal or in his petition, such a claim may be inferred here. <u>See</u>, <u>e.g.</u>, <u>Koso v. Att'y Gen. of New York</u>, 2015 WL 1286014, *3 (E.D.N.Y. Mar. 20, 2015); <u>Orr v. Hulihan</u>, 2012 WL 2478454, *3 (S.D.N.Y. June 28, 2012); <u>Edwards</u>, 589 F. Supp. 2d at 290.[12]

B. <u>Exhaustion of Claims</u>

A petitioner is required to exhaust all of his legal remedies in state court, 28 U.S.C. § 2254(b)(1), which affords the state court an "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." <u>Baldwin v. Rose</u>, 541 U.S. 27, 29 (2004) (quoting <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995)). The petitioner is required to "fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review)." <u>Baldwin</u>, 541 U.S. at 29 (internal quotation omitted); <u>see also Washington v. Goord</u>, 2010 WL 2594310, *3-4 (S.D.N.Y. June 22, 2010).

---

[12] We take this step despite petitioner's seeming abandonment of his sentencing-related claim as something separate and apart from his weight-of-the-evidence claim. <u>See</u> <u>supra</u> pp. 17-18.

Complete exhaustion, however, is not required in every circumstance. <u>See</u>, <u>e.g.</u>, <u>Granberry v. Greer</u>, 481 U.S. 129, 134 (1987); <u>Abuzaid v. Mattox</u>, 726 F.3d 311, 321-22 (2d Cir. 2013); <u>Hernandez v. Lord</u>, 2000 WL 1010975, *4 (S.D.N.Y July 21, 2000). Section 2254 now explicitly allows for the denial of a habeas petition "on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); <u>see</u> <u>also</u> <u>Abuzaid</u>, 726 F.3d at 321-22. Thus, when a petitioner's claim is clearly without merit, "the interests of comity and federalism will be better served by addressing the merits forthwith." <u>Granberry</u>, 481 U.S. at 134; <u>Hernandez</u>, 2000 WL 1010975 at *4 n.8 ("AEDPA codified <u>Granberry</u>'s holding that the merits of an unexhausted claim can be reached.") (citing <u>Gassaway v. Cody</u>, 132 F.3d 42, *2 n.1 (10th Cir. 1997)). The utility of this loosening of the exhaustion requirement was echoed by the Supreme Court, when it noted that "if the court of appeals is convinced that the petition has no merit, a belated application of the exhaustion rule might simply require useless litigation in the state courts." <u>Granberry</u>, 481 U.S. at 133.

Petitioner may be understood to assert two potentially unexhausted claims -- the weight-of-the-evidence claim (interpreted as a sufficiency-of-the-evidence claim) and the challenge to his

sentence, as liberally construed above. See supra pp. 24-26.
Although on direct appeal petitioner framed his claim under the
"weight of the evidence" -- as opposed to "insufficient evidence"
-- his former counsel did nominally rely on the Fourteenth
Amendment principle announced in Jackson v. Virginia. (App. Br.
29). Therefore, the state court was given the "'opportunity to pass
upon and correct' alleged violations of [petitioner's] federal
rights." Baldwin, 541 U.S. at 29 (quoting Duncan, 513 U.S. at 365);
see also Daye v. Att'y Gen. of State of New York, 696 F.2d 186,
191-92 (2d Cir. 1982). Additionally, although petitioner's Eighth
Amendment claim has not been exhausted in the state courts, it is
clearly without merit, see infra pp. 45-47, and we therefore deem
it appropriate to use the discretion afforded to us by Section
2254(b)(2) to reach the substance of this claim as well, despite
petitioner's failure to exhaust.

III. The Merits of Petitioner's Claims

    A. Sufficiency of the Evidence

        i. Constitutional Standards

A conviction based on insufficient evidence violates the Due Process clause of the Fourteenth Amendment. Jackson, 443 U.S. at 316. As the Court set forth in Jackson, it is

> an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

Id. The central inquiry on a challenge to the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original).

This standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012); see also Santone v. Fischer, 689 F.3d 138, 148 (2d Cir. 2012);

Harnett v. Conway, 2014 WL 6390285, *4 (S.D.N.Y. Nov. 17, 2014);
Graham v. Lape, 476 F. Supp. 2d 399, 403 (S.D.N.Y. 2007) ("All
permissible inferences are drawn in favor of the prosecution, the
verdict can be based entirely on circumstantial evidence, and the
government is not required to refute every possible hypothesis
supporting the defendant's innocence."). In other words, a court
will "defer[] to the jury's assessments of the witnesses'
credibility." United States v. Arena, 180 F.3d 380, 391 (2d Cir.
1999) (citing cases), abrogated in part on other grounds by
Scheindler v. Nat'l Org. for Women, Inc., 537 U.S. 393 (2003).

In sum, "on habeas review, a federal court may not overturn a
state court decision rejecting a sufficiency of evidence challenge
simply because the federal court disagrees with the state court.
The federal court instead may do so only if the state court
decision was objectively unreasonable." Coleman, 132 S.Ct. at 2062
(internal quotations omitted).

Finally, when the insufficient-evidence claim arises from a
state conviction, a habeas court "must look to state law to
determine the elements of the crime." Quartararo v. Hanslmaier, 186
F.3d 91, 97 (2d Cir. 1999); Piniero v. Conway, 2011 WL 1226300, *2
(S.D.N.Y. Mar. 31, 2011).

30

## ii. Elements of the Underlying State Crime

Petitioner was convicted of criminal sale of a controlled substance in the third degree under N.Y. Penal Law § 220.39(1). The statute states that "[a] person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells . . . a narcotic drug." Id.

Intent may be established "by what he said verbally either before, during or even after the commission of the crime." People v. Samuels, 282 A.D.2d 102, 107, 726 N.Y.S.2d 71, 76 (1st Dep't 2001) (holding that "defendants' statements made during the transaction amply demonstrated that they intended to sell crack . . . Moreover, if their statements were not enough, their conduct, which as explained at trial, evinced all of the earmarks of an organized street-level drug-selling operation, left no doubt that they intended to sell crack.").

A defendant may be found guilty under this statute for acting as a lookout or steerer in an illegal drug transaction. See People v. Gilbert, 7 A.D.3d 286, 287, 776 N.Y.S.2d 53, 54 (1st Dep't 2004) ("The totality of defendant's interactions with other persons present warrants the conclusion that defendant was a participant in

31

the drug transaction, whose role, at a minimum, consisted of evaluating the undercover officer as a prospective purchaser."); People v. Pena, 270 A.D.2d 218, 218, 706 N.Y.S.2d 384, 385 (1st Dep't 2000) ("There was ample evidence of defendant's active participation in the transaction, including evidence that, in showing the undercover officer the location of the drug operation, defendant said 'we moved down to the basement' and that defendant directed a codefendant to let the officer under the door at the bottom of the outside basement stairs."); People v. Fernandez, 193 A.D.2d 406, 406-07, 597 N.Y.S.2d 68, 69 (1st Dep't 1993) ("Defendant's unprompted communication to the seller of his approval of the buyer, and his role as a 'lookout' at the request of the seller, combined with his observed close interaction with the seller before, during and after the sale, creates a reasonable inference that defendant was acting intentionally to aid the seller in safely consummating the sale"); see also People v. Robinson, 123 A.D.3d 1224, 1225-26, 999 N.Y.S.2d 555, 557-59 (3d Dep't 2014).

In this case, testimony elicited at trial established, inter alia, that petitioner (1) asked Mr. Raynor if he was "sure [he] knew" one of the undercover officers, (2) instructed Mr. Howell to bring UC 0014 around the corner to 124th and Park Avenue, where the sale took place, (3) stood approximately a car-length away while UC

32

0014 gave Howell the pre-recorded buy money in exchange for four "twisties," (4) was described by UC 0014 as wearing clothes that matched the description of the individual eventually arrested by Detective Toro, and (5) while not in possession of the pre-recorded money or drugs himself, was arrested alongside Mr. Howell, who was in possession of both. See supra p. 8.

Petitioner bears a heavy burden to demonstrate that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. Without revisiting the fact-finder's credibility determinations and viewing the evidence in a light most favorable to the prosecution, we reject petitioner's assertion that the "State of New York proffered no material or factual evidence to support the jury's verdict of guilt absent incredible police testimony." (Pet'r's Reply ¶ A(2)(a)). Despite the inconsistencies contained in the officers' trial testimony -- such as UC 0014 not being sure whether he had radioed the description of one defendant, UC 0014 providing some conflicting information about where the pre-recorded buy money was distributed, and the undercover officers' differing accounts of the length of the encounter (Trial Tr. 42, 48, 71; see also App. Br. 30-35) -- petitioner makes no allegations of insufficiency beyond the credibility of the officers' testimony, and that cannot be a

33

basis for habeas relief. See Marshall v. Lonberger, 459 U.S. 422, 434 (1983); Garrett, 483 F. Supp. 2d at 470. Accordingly the conviction and its affirmance by the Appellate Division cannot be deemed contrary to or an unreasonable application of Supreme Court precedent.

### iii. Actual Innocence Claim

Within petitioner's sufficiency-of-evidence claim, he asserts a claim of actual innocence. (See Pet. ¶ 13; Pet'r's Reply ¶ A(2)(a)). Petitioner argues that "'actual innocence' and 'conviction against the weight of the evidence' are synon[y]mous claims." (Id.). The two claims, however, are not synonymous: Whereas weight-of-the-evidence and sufficiency-of-the-evidence claims are based on the evidence at trial, a claim of actual innocence is based on new evidence or evidence that was not available at trial. Compare Garrett, 438 F. Supp. 2d at 470-71 with McQuiggin v. Perkins, 133 S.Ct. 1924, 1929 (2013) ("Perkins asserted newly discovered evidence of actual innocence. He relied on three affidavits, each pointing to Jones, not Perkins, as Henderson's murderer."); see also White v. Conway, 2011 WL 1315714, *5 (N.D.N.Y. Jan. 18, 2011) ("A showing of actual innocence

requires more than merely arguing that the jury's finding of guilt is against the weight of the evidence.").

A claim of actual innocence may be asserted as a means to overcome a procedural hurdle -- such as the statute of limitations -- in a habeas corpus proceeding. McQuiggin, 133 S.Ct. at 1931; Schlup v. Delo, 513 U.S. 298, 313-17 (1995). The petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup, 513 U.S. at 327 (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)). To meet this standard, "a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" McQuiggin, 133 S.Ct. at 1935 (quoting Schlup, 513 U.S. at 327).

A habeas court, however, may not consider an assertion of actual innocence as a freestanding claim for relief. See, e.g., Herrera v. Collins, 506 U.S. 390, 401 (1993)[13]; Medina v. McGinnis,

---

[13] Herrera, itself a capital case, perhaps left open the remote possibility that this principle would not apply in the most extreme of situations:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue

35

2004 WL 2088578, *27 (S.D.N.Y. Sept. 20, 2004). In <u>Herrera</u>, the Supreme Court stated, "our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." 506 U.S. at 404. Therefore, the Court denied that petitioner's claim because "he does not seek excusal of a procedural error so that he may bring an independent constitutional claim challenging his conviction or sentence, but rather argues that he is entitled to habeas relief because newly discovered evidence shows that his conviction is factually incorrect." <u>Id.</u> "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution -- not to correct errors of fact." <u>Id.</u> at 400; <u>see also</u> <u>Johnson v. Bellnier</u>, 508 Fed. App'x 23, 26 (2d Cir. 2013).

---

open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

506 U.S. at 417. Obviously, the petition before us -- not even relating to a capital case -- does not approach this threshold.

Brown's petition for habeas relief cannot be premised on actual innocence. In his petition, he does not assert a claim of actual innocence to overcome a procedural bar or other procedural obstacle. Rather, he requests that this court grant him habeas relief on the basis that he was wrongfully convicted. (See Pet. ¶ 13; Pet'r's Reply ¶ A(2)(a)). Such a claim is not permitted on habeas review, as the Supreme Court in Herrera made plain. Moreover, even were we to consider this claim, Brown's petition and reply do not proffer new evidence that was not available at trial, a requirement of actual innocence. See McQuiggin, 133 S.Ct. at 1929. He instead erroneously conflates actual innocence with his claim regarding the weight of the evidence. (See Pet. ¶ 13; Pet'r's Reply ¶ A(2)(a)) Therefore, petitioner's actual innocence claim fails for this reason as well.

## B. Right to a Public Trial

Petitioner's second claim is that the trial court denied him his Sixth Amendment right to a public trial by not permitting his co-workers to attend the testimony of the undercover officers. (Pet. ¶ 13). This claim is meritless.

The Supreme Court has emphasized that "[t]he requirement of a public trial is for the benefit of the accused." Waller, 467 U.S. at 46 (quoting Gannett Co. v. DePasquale, 443 U.S. 368, 380 (1979)). Such benefits include "'the public . . . see[ing] he is fairly dealt with and not unjustly condemned[,] . . . keep[ing] his triers keenly alive to a sense of their responsibility and to the importance of their functions'[,] . . . encourag[ing] witnesses to come forward and discourag[ing] perjury." Id. (quoting Gannett, 443 U.S. at 380 & citing In re Oliver, 333 U.S. 257, 270 n.24 (1948)); see also United States v. Gomez, 705 F.3d 68, 73-74 (2d Cir. 2013); Morales v. United States, 635 F.3d 39, 44 & n.11 (2d Cir. 2011).

The Supreme Court has recognized, however, that "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." Waller, 467 U.S. at 45. The Court further noted that "such circumstances will be rare, however, and the balance of interests must be struck with special care." Id. To achieve this balance, the Supreme Court established a four-part test to determine whether a defendant's right to an open trial has been violated. "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure

38

must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." Id. at 48.

Under Waller, petitioner's Sixth Amendment claim does not warrant habeas relief. The Second Circuit has explicitly and repeatedly emphasized that "the State has an 'overriding interest' in protecting the identity of its undercover officers." Rodriquez v. Miller, 537 F.3d 102, 108 (2d Cir. 2007); see also Hargett v. Giambruno, 291 F. App'x 402, 404 (2d Cir. 2008); Sevencan v. Herbert, 342 F.3d 69, 76 (2d Cir. 2002); Wilkerson v. New York State Bd. of Parole, 2015 WL 678581, *15-16 (S.D.N.Y. Feb. 17, 2015). In our case, the undercover officers' testimony at the Hinton hearing demonstrated the importance of their continued anonymity: They had been threatened in the past and intended to continue performing their duties in this neighborhood in the future. See supra pp. 3-4. Accordingly, maintaining their anonymity was unquestionably "an overriding interest that [was] likely to be prejudiced" in the absence of such protection. Waller, 467 U.S. at 48.[14]

---

[14] We note that the Second Circuit has long advanced a somewhat less burdensome test for the first Waller factor in the context of partial courtroom closures, namely that the government proffer a "substantial reason" for the closure. See, e.g., Woods

39

The second element of the <u>Waller</u> test -- that "closure must be no broader than necessary to protect" the aforementioned interest -- is also met here. <u>See id.</u> In <u>Rodriguez</u>, for example, the Second Circuit held that a "closure [that] was to last only for the duration of the Undercover's testimony" was constitutional. 537 F.3d at 110. In <u>Wilkerson</u> -- a recent District Court case with particular relevance here -- Judge Woods found <u>Waller</u> satisfied in the following context:

> First, the courtroom was closed only during the undercover officer's testimony . . . Second, although the trial court did not allow the public to view the officer's live testimony, a transcript was made of the officer's testimony . . Third, the trial court allowed [petitioner]'s family members to stay in the courtroom once it determined that their presence was not likely to threaten the officer's safety.

2015 WL 678581 at *16. The Court plainly rejected an argument that "the [trial] court's exclusion of a 'close family friend' demonstrated that the closure was overly broad" and noted that a court's refusal to exempt a defendant's friend from a courtroom closure "is not contrary to clearly established federal law as

---

v. Kuhlmann, 977 F.2d 74, 76 (2d Cir. 1991). While this test may indeed have continued salience -- even in the context of habeas review, see <u>Mickens v. Larkin</u>, 2014 WL 6632950, *1-3 (S.D.N.Y. Nov. 24, 2014) -- we need not address it here. The prosecutor easily met its burden under <u>Waller</u>'s stricter "overriding interest" standard, rendering an analysis of whether the same interest provides a "substantial reason" for the closure obviously superfluous. See <u>Cotto v. Fisher</u>, 2012 WL 5500575, 32-33 (S.D.N.Y. Aug. 23, 2012).

determined by the Supreme Court." Id. (citing Goris v. Goord, 2006 WL 2347812, at *7 n. 4(S.D.N.Y. Aug. 10, 2006)).

Here, as in Rodriguez and Wilkerson, the courtroom was only closed during the officers' testimony. (Hinton Tr. 39-41). Additionally, the trial court allowed petitioner's niece and girlfriend to be present during the officers' testimony.(Id.). Petitioner in effect argues that because his co-workers were denied entry, the courtroom closure was overly broad. (Pet. ¶ 13). However, given the limited scope of the closure and the ubiquitous view that partial (if not full, see Rodriguez, 537 F.3d at 110) closures are permissible under Waller when protecting the anonymity of undercover officers, the trial court's closure decision and the affirmance by the Appellate Division cannot be said to have been "contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d); accord, e.g., Wilkerson, 2015 WL 678581 at *16; Loney v. New York State Dep't of Corr., 632 F. Supp. 2d 337, 346-47 (S.D.N.Y. July 8, 2009); Ingram v. Pearlman, 2007 WL 1087207, *2-3 (S.D.N.Y. Apr. 9, 2007).

The third requirement under Waller is that the court consider reasonable alternatives to complete closure. Waller, 467 U.S. at 48. Courts in this Circuit have repeatedly considered a number of alternatives to be reasonable under Waller, including making a

transcript of the officer's testimony available to the public, <u>see</u>,
<u>e.g.</u>, <u>Brown</u>, 283 F.3d at 502, closing the court only so long as
needed for the undercover officers to testify, <u>see</u>, <u>e.g.</u>, <u>Bright v.
Cook</u>, 2011 WL 4406348, *4 (S.D.N.Y. Sept. 11, 2011), and permitting
specifically-considered family members to remain in the courtroom
when their presence did not threaten officer safety. <u>See</u>, <u>e.g.</u>,
<u>McCarthy v. Portuondo</u>, 2001 WL 826702, *7 (E.D.N.Y. May 25, 2001);
<u>see also United States v. Fernandez</u>, 590 F. App'x 117, 119 (2d Cir.
2015); <u>Wilkerson</u>, 2015 WL 678581 at *16; <u>Ingram</u>, 2007 WL 1087207 at
*3 .


Petitioner's <u>Hinton</u> hearing resulted in the trial court
adopting some form of <u>each</u> of these possible alternatives to a
complete closure: The transcript of the undercover officers'
testimony is publically available, the closure lasted only as long
as UC 0014 and UC 0091 were testifying, and petitioner's niece and
girlfriend were permitted to attend. (<u>See</u> <u>Hinton</u> Tr. 39-14; Trial
Tr. 3-94). Moreover, the suggested problem with the closure -- the
exclusion of petitioner's co-workers -- was certainly <u>considered</u>
(<u>see</u> <u>Hinton</u> Tr. 38-39), which ultimately is the only requirement
made explicit under <u>Waller</u>. 467 U.S. at 48.


The final requirement under <u>Waller</u> -- that the trial court
"make findings adequate to support the closure," <u>Waller</u>, 467 U.S.

at 48 -- is similarly easily met. The trial judge ordered the limited closure of the courtroom following a <u>Hinton</u> hearing, where the two undercover officers testified. (<u>Hinton</u> Tr. 23-33). Both UC 0014 and UC 0091 explained that they had ongoing operations in the relevant location and that they had been threatened in the past. (<u>Id.</u>). UC 0014 testified that "my fear is that, you know, they will find out who I am, harm might come to myself and my partner." (<u>Id.</u> at 26). UC 0091 stated that testifying without anonymity would be a "great danger for myself as well as my family, because through your name, you can find out various public information." (<u>Id.</u> at 33). Based on this testimony, the judge made explicit findings about the importance of these officers' work and the danger that would result in the absence of some kind of closure. (<u>Id.</u> at 39-41). He concluded as follows:

> Based upon all of that, I find that with the exception of the family who are going to be allowed to be here, it is appropriate to close the courtroom . . . I find that proceeding any other way would endanger the lives and seriously damage other investigations being conducted by these officers.

(<u>Id.</u> at 41). As such, it is abundantly clear that the trial judge "ma[d]e findings adequate to support the closure." <u>Waller</u>, 467 U.S. at 48. Petitioner's second basis for relief is therefore unavailing.

43

To conclude, we note that petitioner's reliance on New York's approach to the subject of excluding family and friends from the courtroom -- contained in his brief to the Appellate Division (see App. Br. 39-41) -- is misplaced. See supra pp. 16-17. Indeed, while the Second Circuit has noted the "importance our Circuit and the Supreme Court have placed on having family members and friends attend trial," it has also made clear that

> neither Waller nor any other Supreme Court holding acknowledged the appropriateness of a different standard for the exclusion of family members than for the exclusion of the general public, [and] an inferior court may not justify a grant of habeas corpus relief under § 2254 by reference to such a heightened standard.

Gibbons v. Savage, 555 F.3d 112, 116 (2d Cir. 2009). Thus, none of the holdings or rationales contained in cases such as People v. Nazario, 4 N.Y.3d 70, 72, 790 N.Y.S.2d 628, 629-30 (2005) -- which may indeed reflect a somewhat higher burden for closure in these contexts -- affects in any way our task of assessing petitioner's claims under Waller. We therefore agree with respondent that "no clearly established federal law 'demand[s] a higher showing before excluding a defendant's friends and family' from the courtroom.'" (Opp. Mem. 19 (quoting Rodriquez, 537 F.3d at 106)).

44

C. <u>The Sentencing Claim</u>

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend VIII. Yet, the length of a state defendant's sentence, if within statutory limits, is not ordinarily a matter of constitutional significance. See, e.g., White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam); McCray v. Graham, 2014 WL 6790756, *20 (S.D.N.Y. Dec. 3, 2014); Paul v. Ercole, 2010 WL 2899645, *6 (S.D.N.Y. June 10, 2010). Constitutional review of state sentencing decisions is generally limited to whether the sentence exceeded the statutory maximum, see, e.g., Jones v. Thomas, 491 U.S. 376, 381 (1989); whether the sentencing court relied upon constitutionally impermissible considerations, see, e.g., Alabama v. Smith, 490 U .S. 794, 798-800 (1989); Texas v. McCullough, 475 U.S. 134, 141-44 (1986); whether it relied upon materially incorrect information, see, e.g., Townsend v. Burke, 334 U.S. 736, 740-41 (1948); United States v. Malcolm, 432 F.2d 809, 815-16 (2d Cir. 1970); and whether the sentence violated the Ex Post Facto or Double Jeopardy clauses. See, e.g., Miller v. Florida, 482 U.S. 423, 431-33 (1987), abrogated on other grounds, Johnson v. United States, 529 U.S. 694 (2000); United States v. Meeks, 25 F.3d 1117, 1120 (2d Cir. 1994); Stewart v. Scully, 925 F.2d 58, 62 (2d Cir. 1991). The habeas court

45

may also review whether a state sentence was "constitutionally disproportionate" in view of the facts of the case, but relief based on such a claim is "exceedingly rare" in non-capital cases. See, e.g., Graham v. Florida, 560 U.S. 48, 72 (2011); Lockyer v. Andrade, 538 U.S. 63, 72 (2003); Ewing v. California, 538 U.S. 11, 21 (2003) (O'Connor, J.) (quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980)); Harmelin v. Michigan, 501 U.S. 957, 966 (1991) (Scalia, J.); United States v. Rivera, 546 F.3d 245, 255 (2d Cir. 2008); Bethea v. Scully, 834 F.2d 257, 261 (2d Cir. 1987) (quoting United States v. Ortiz, 742 F.2d 712, 714 (2d Cir. 1984) (quoting Solem v. Helm, 463 U.S. 277, 290 n.16 (1983))); see also Stanley v. Smith, 2014 WL 5039444, *22 (S.D.N.Y. Sept. 26, 2014).[15]

---

[15] As the Supreme Court observed in Harmelin:

Here . . . the [State] Legislature has mandated the penalty and has given the state judge no discretion in implementing it. It is beyond question that the legislature has the power to define criminal punishments without giving the courts any sentencing discretion. Since the beginning of the Republic, Congress and the States have enacted mandatory sentencing schemes. To set aside petitioner's mandatory sentence would require rejection not of the judgment of a single jurist . . . but rather the collective wisdom of the [State] Legislature and, as a consequence, the [State] citizenry. We have never invalidated a penalty mandated by a legislature based only on the length of sentence, and, especially with a crime as severe as this one, we should do so only in the most extreme circumstance.

501 U.S. at 1006-07 (internal citations and quotations omitted); accord Townsend v. Burke, 334 U.S. 736, 741 (1948).

In this case, petitioner was convicted of criminal sale of a controlled substance in the third degree under N.Y. Penal Law § 220.39(1), a class B felony. Additionally, petitioner had a prior violent-felony conviction, which imposes a longer sentence. See N.Y. Penal Law § 70.71(4)(b)(i). Accordingly, the statutory range for his conviction was between six and fifteen years. Id.[16] Petitioner was sentenced to seven years in prison, with three years of post-release supervision. (Sentencing Tr. 22). His sentence was well within the statutory range -- indeed, near the bottom of the range. Since he proffers no other basis to challenge that sentence, his claim of an excessive sentence under the Eighth Amendment is meritless.

## CONCLUSION

For the reasons stated, we recommend that Brown's petition for habeas corpus be denied. Petitioner having failed to make a "substantial showing of the denial of a constitutional right," see 28 U.S.C. § 2253(c)(2), we also recommend that no certificate of appealability be issued.

---

[16] This range was uncontested at the sentencing hearing. (Sentencing Tr. 13).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Valerie E. Caproni, Room 240, 40 Foley Square, New York, New York 10007-1312 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

**Dated:   New York, New York**
       **April 22, 2015**

                      **RESPECTFULLY SUBMITTED,**

                      **MICHAEL H. DOLINGER**
                      **UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been
mailed this day to:

**Clayton Brown**
Din. 11-R-2028
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, New York 12788-1000


**Alyson J. Gill, Esq.**
**Daniel Jawor, Esq.**
Assistant Attorneys General
120 Broadway
New York, NY 10271